DENBOW, Respondent, v. TESCH, et al, Appellants.

(278 N. W. 16.)

(File No. 8074. Opinion filed February 25, 1938.)

*Caldwell & Burns,* of Sioux Falls, for Appellant.
*Danforth & Davenport,* of Sioux Falls, for Respondent.

SMITH, J. The complaint in this action contained two causes of action. In the first cause of action the plaintiff, Isabel Denbow, sought the cancellation of an agreement executed between herself and her brothers and sister, alleging that her consent to said agreement had been procured through menace and duress. In her second cause of action she seeks an accounting for the benefit of the estate of her deceased father as against her brother, Walter Bones. The learned trial court found that the agreement had been procured by duress and menace, and entered its judgment avoiding the agreement and fixing an amount as due from Walter Bones to the estate. Thereafter, the court denied a motion for a new trial. Under appropriate assignments of error we are required to review the evidence to determine its sufficiency to support the findings, conclusions, and judgment. It having been conceded upon oral argument that the judgment against Walter Bones must fall with the judgment upon the first cause of action, we confine our analysis to the first cause of action.

The parties to this action are the surviving children of John T. Bones and Mary Bones. It appears from the record that the parents had accumulated considerable property, part of which was owned by the wife, and the remainder by the husband. The wife died in 1929. Prior to her death she had prepared certain deeds conveying all of her real property to the three children, Victoria, Fred, and Isabel. The portion of the property described in said conveyances to Victoria and Fred were subject to incumbrances in the amount of $7,400, respectively, and the property described in the conveyances to Isabel was clear. According to the testimony of plaintiff, these conveyances were delivered to her prior to her

mother's death. According to the testimony of Victoria, the conveyances were found in her mother's cedar chest two days after the mother's death.

During his life, the father had made a cash advance to Harry in the sum of $28,000 which had been somewhat reduced by the reconveyance to the father of a quarter section of land, and he had made certain other cash advances to other children. The father had also turned over certain real estate to Walter for a consideration of $34,000 to be paid to the father in monthly installments, or as he needed it for his maintenance and support. At the time of the father's death on April 5, 1935, no property remained in his name but the family home in Sioux Falls, together with an adjoining lot, and his household goods and a balance due from Walter Bones. Just a few months prior to his father's death, Walter Bones delivered to him a statement purporting to show the balance due. This statement was taken home by the father, exhibited to the plaintiff, Isabel Denbow, and placed in his account book.

The plaintiff is a woman of ordinary intelligence and experience in life of the age of forty years. At the time in question she was conversant with her father's affairs. The remaining children were all older than plaintiff and, with the exception of Walter, were fairly comparable to plaintiff in intelligence and experience. Walter Bones was a man of wide business experience and strong, if not compelling, personality.

On May 9 and 10, 1935, the children executed the agreement in question, which reads as follows:

"Sioux Falls, South Dakota, May 9, 1935

'This agreement entered into by and between the undersigned agree to settle on Father's and Mother's estates as agreed upon as follows:

"First: Charge each of our accounts with the cash and real estate or personal property given to us by our Father and Mother at the agreed upon prices or valuation of property as agreed to today as per figures attached. ·

"Second: Credit each account with any debts against property such as mortgages, and then arrive at net cash each of us has received.

·."Third: After the net amount has been' arrived at, charge my account with five percent interest from its date to August 6, 1935.

"Fourth: When net balance has been arrived at, all of us agree the sale of any property is to be divided to arrive at an equal division of property, that is, all are to share equal in property division. No one to receive more than another one.

"Fifth: If Walter Bones, the undersigned, has already received more than his share, it is agreed that he will pay to the others the surplus amount over and above the average.

"Sixth: Before any settlement is made, a tomb stone is to be purchased under $300.00.

"Seventh: The house is to be repaired and offered for sale at $5,000.00 or more, net. If it cannot be sold within four months it is to be rented, one lot to be sold for $500.00 or more.

"Eighth: We all agree Victoria Tesch is to be appointed Administrator and Walter Bones will go her bond if accepted by the Court.

"Ninth: We agree to pay Isabel Denbow $30.00 per month for the care, clothing, and support of our Aunt Margaret Wagner, until such time as Fred Wagner or Ida shall arrange or provide for her care and support, if they do so, starting April 6, 1935.

"We also agree to set aside $300.00 to cover the funeral expenses of Margaret Wagner. All personal property in the home is given to Victoria and Isabel for them to divide as they see fit.

"Signed H. D. Bones, Victoria Tesch, Walter Bones, Fred H. Bones, Isabel Denbow, and witnessed by Francis A. Benson and Walter Tesch.

"It is further agreed Isabel Denbow is to have $275.00 cash as final settlement of Margaret Wagner's care and expenses for the past five and one-half years. ·If our Father has received more cash for rent from Isabel's farm than the amount he paid out for fencing and taxes, we agree to give Isabel's account credit covering the balance over and above the amount paid out.

' "List of property received from J. T. and Mary Bones since 1920. Walter—1½ lots, net $1,000.00, 320 acres land, $34,000.00, less all cash advanced as per statement.

"Victoria—1½ lots, net $400.00, farm 160 acres, $12,800.00 less mortgage about $7,400.00, cash $1,300.00.

"Fred—160 acres, $14,500.00 less mortgage about $7,400.00.

"Isabel—160 acres $12,800.00.

"Harry—cash about $28,000.00, credit 160 acres, $19,600.00.

"Dated May 9, 1935.

"Signed H. D. Bones, Walter Bones, Victoria Tesch, Fred H. Bones, Isabel Denbow, and witnessed by Francis A. Benson and Walter Tesch."

This agreement had its inception as the result of three conferences had between all or part of the children on May 9th and 10th. The plan to negotiate a settlement wherein all would share equally in the family property originated with the boys. The first conference occurred between the hours of 4 and 6 in the afternoon of May 9th, and was between all of the children. The second conference was in the evening of the same day and was between the plantiff and her brothers Walter and Harry, and the third conference was had during the next day commencing at times variously fixed at from 7 to 10 in the morning, and extending to about 2 o'clock in the afternoon. Some clarity of understanding is gained through the separate treatment of these three conferences.

The plaintiff lived in the family home where she and her father had lived since the death of her mother. The home of Victoria Tesch, the sister, was located next door. At about 4 o'clock in the afternoon of May 9th, the brother Walter called at the home of the plaintiff and asked her to come to Victoria's home where the children were assembled, stating that they desired to settle up the father's estate. According to the testimony of the plaintiff, she told Walter that 'she did not want to go; that there wasn't anything for her to do there." However, she accompanied Walter to the home of her sister where she found her other brothers and her sister. "Walter was the spokesman and he wanted to settle up the estate and divide things." A considerable period of time was used in listing what each child had received from their parents and in fixing the value thereof. Plaintiff admits that she had a part in this conversation and made

some objections or suggestions with reference to valuations. According to the testimony of the defendants, the agreement in question was written in its original form at this conference. The plaintiff testified that she could not remember whether it was written there or whether it had been written theretofore and was produced at the conference. The agreement was in the handwriting of Walter. Plaintiff testified that she refused to sign this agreement at this conference, and the defendants asserted that she left while they were signing, without indicating whether she would or would not sign. With reference to this conference, plaintiff testified: "* * * I was in such a nervous state when he had that agreement to sign that I don't remember about it. The cause for my nervousness was that they all pitched on to me, the four of them, and what the one couldn't think of saying, the others did, * * * and that there were four against one."

During the evening Walter and Harry called at the home of plaintiff. They asked for the box in which the father kept his papers. Plaintiff testified: "* * * I said before I would get it that I wanted to know how much money my father had, and he (Walter) said approximately $20,000.00."

A heated controversy ensued, first, over the production of the box, and, second, over the fact that it did not contain any of the father's important papers when produced. Walter demanded that she produce the statement which he had furnished to his father. She refused, and plaintiff testified that Walter said, "I had stolen the statement, and he threatened to have me arrested if I did not give it to him." And she further testified that they used curse words and that her brother Harry had said "that I was the worst person that ever was, that I had two men and I couldn't get along with either of them, and that I made trouble all the time, that I wouldn't do anything anybody wanted me to."

During this conference, after plaintiff had refused to produce the statement, Harry suggested that they would search the house for it, and plaintiff threatened to go up stairs and get a gun and shoot Harry, upon which Walter said: "Isabel, you are insane. If we would do the right thing, we would simply send you to Yankton, where you belong. No sane person would talk as you have."

And Harry said, "When you get your gun, you want to do a good job." Plaintiff ordered Harry out of the house, and he refused to go. According to the defendants Harry and Walter, plaintiff "sulked" on them, and plaintiff testified, "He stayed there until after eleven o'clock trying to get me to sign that piece of paper or give him that statement." She did not sign, and she never produced the statement until upon the trial of this action.

The following morning the three brothers first appeared at the home of plaintiff, and a short time later the sister, Victoria, arrived. A long final conference ensued. The children first checked over the property in the house, some of which belonged to plaintiff. An inventory was made of the property belonging to the estate. After the division of this property was agreed upon as between the two girls, Walter said, in substance, "Isabel, why can't you be as nice all the time as you have been about the division of these household goods?" The plaintiff was again urged to sign the agreement. As it was originally drawn it provided for repayment by any child who had received more than his share of the family property. According to the defendants, plaintiff stated that she would not mortgage her farm for that purpose, and the agreement was thereupon changed so as to make this provision applicable solely to Walter. The defendants further testified that she raised some question about advances she had made in the care of the sister of her mother, and that a provision was inserted covering that matter. A further change was made at this conference dealing with the income the father had received from the land in plaintiff's name. Harry admits that he stated during this conference "that if she was looking for trouble, she ought to have it and get plenty of it." Plaintiff testified that Walter said, "If I didn't sign it, he would law it and law it." She also testified that Harry said he would like to beat her, and that Walter said "If I would sign it, there wouldn't be any inheritance tax" (referring to inheritance tax upon the land plaintiff received from her mother). At one time during these hours plaintiff said she would have to see her attorney, and Harry said they had always been able to do business without an attorney, and that he thought they were still capable of it. At about 2 o'clock plaintiff finally signed the agreement. She testified that she had

had nothing to eat that day, and "Finally I signed some paper that they presented. It seemed that was the only way to get them out of the house. * * I was nervous by that time and upset. I would do almost anything to get them out of my home. * * * I signed it because they irritated me and drove me to sign it. They were at it sixteen hours trying to get me to sign."

The defendants testified that after the agreement was signed, Isabel put her arms around the neck of Walter and said to him, "You are a good salesman, and I am glad to have the matter settled up." Isabel said, as regards this statement, "If I did, I didn't know what I was doing."

One of the defendants admitted on the stand that "Isabel was very hard to handle," and the plaintiff testified on rebuttal, "I wouldn't have signed the contract, * * * except for the statements and threats that I claim the parties made to me."

Although plaintiff testified on her direct examination, "They said if I wouldn't sign that, they would send me to Yankton where I belonged," upon cross-examination the following questions were asked and answers given:

"Q. That threat to send you to Yankton was two weeks later when they asked you to sign the deed? A. They said I was crazy when I wouldn't sign this too."

"Q. When you hesitated about signing this, they said you were crazy but they didn't threaten to send you to Yankton? A. I don't know about that."

That such a threat was made after the agreement was signed at a time when plaintiff's signature was sought to a deed is not denied.

A large body of testimony favorable to the contentions of the defendants, as well as denials of the defendants, are omitted, and we have attempted to set forth only such testimony as tends in any degree to support the findings of the court.

The principal challenge of the assignments of error is directed towards the fifth finding of fact and the conclusions of law of the court. This finding covers several pages of the brief, but when it is carefully analyzed it appears that the court found that the defendants threatened that if plaintiff did not sign the agree-

ment (1) she would get nothing; (2) that Walter would present a claim against the estate; (3) that there would be litigation until plaintiff would get nothing; (4) that the property of plaintiff would be withheld from her and lost to her through numerous law suits; (5) that they would arrest her on a criminal charge; and (6) that they would attempt to send her to an insane asylum on a charge that she was crazy. Special emphasis was placed by the court upon the threats which we have numbered (5) and (6), supra. As to them the court found: "* * * Heatedly told plaintiff that she was insane and that if they did the right thing, they would send her where she belonged, refused to leave her house at her demand, threatened to search the house and made threats which were suitable to cause her to believe, and did cause her to believe that they would arrest her on a criminal charge or would attempt to send her to an insane asylum on a charge that she was crazy if she did not sign the agreement."

 Does the evidence support a finding that the defendants threatened to arrest plaintiff or send her to Yankton if she refused to sign the agreement? Analysis of the evidence convinces us that this question must receive a negative answer. Although plaintiff stated positively on direct examination that they did threaten to send her to Yankton if she did not sign, she retracted the statement on cross-examination. When asked the direct question on cross-examination, she said, "I don't know about that." It thus appears that this finding must stand or fall on such inferences as may fairly and reasonably be drawn from the conference with her two brothers on the evening before the final execution of the contract. Admittedly the testimony reveals that Walter then threatened to have her arrested if she did not produce the statement he had furnished his father, and also that when she threatened to get her gun and shoot Harry, Walter told her that if they did the right thing they would send her to Yankton where she belonged; that no sane person would talk as she did. It seems clear to us that the threat to have her arrested, the threat to shoot, and the reference to insanity, are all of a piece. They were all part and parcel of a mutual outburst of temper relating to the refusal of plaintiff to produce the statement for which her brothers had made demand. Walter became exasperated and made

a childish threat as to what he would do if she did not produce it; Harry threatened to search the house, and plaintiff countered with a threat a shoot him; whereupon Walter questioned her sanity. These threats did not relate to her refusal to sign the agreement, and in our opinion are not sufficient to sustain the findings.

With these purported threats removed there remains for consideration but a single threat, namely, "to law it and law it" if she did not sign. This threat by Walter must have been used by the court as the basis for its finding covering threats (1) to (4), inclusive, to which we have adverted supra. Suffice it to say that if it be assumed that this feeble threat was effective in coercing the signature of plaintiff, it is not such a threat as will support a conclusion that the consent of plaintiff to the contract was procured through duress and menace. Sections 813 and 814, Revised Code of 1919; McCormick et al. v. Volsack, 4 S. D. 67, 55 N. W. 145. This is not a threat of confinement of the person, of unlawful or violent injury to the person or property of, or of injury to the character of, plaintiff. In determining what constitutes duress or menace, equity follows the law. Pomeroy's Equity Jurisprudence, 4th Ed., § 950.

The briefs of respondent stress the character and relations of these parties, and the enlightened, modern view of the courts under which the coercive effect of a threat is measured according to subjective tests rather than through objective tests based on external standards. Until a threat has been established which will support a legal conclusion that duress or menace has been employed, there is no occasion for the use of any test or of any standard to measure its effect on an individual mind.

A further assignment challenges the finding of the trial court upon the subject of consideration. The learned trial court found that the contract was wholly without consideration as far as plaintiff is concerned. We are at a loss to understand the reasoning of the trial court, and conclude that counsel for respondent have been unable to evolve a supporting theory because they have failed to discuss this assignment in their brief. That the contract is supported by a valid consideration appears from a cursory examination of its provisions.

We are irresistibly led to the conclusion that the clear preponderance of the evidence is against the findings of the court that the defendants "made threats which were suitable to cause her to believe, and did cause her to believe that they would arrest her on a criminal charge or would attempt to send her to an insane asylum * * * if she did not sign the agreement," and that "said contract was wholly without consideration so far as the plaintiff is concerned."

It follows that the conclusions of law of the court are without support.

Therefore, the judgment and order of the trial court must be, and they are, reversed.

ROBERTS, P.J., and POLLEY and RUDOLPH, JJ., concur.

WARREN, J., dissents.